IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:16CR72DPJ-LRA-3

L. C. HATFIELD, JR.




**DETENTION HEARING**




BEFORE THE HONORABLE LINDA R. ANDERSON
UNITED STATES MAGISTRATE JUDGE
SEPTEMBER 23RD, 2016
JACKSON, MISSISSIPPI


APPEARANCES:

FOR THE GOVERNMENT:  MR. CHRISTOPHER WANSLEY

FOR DEFENDANT MARTIN:  MR. AAFRAM SELLERS

FOR DEFENDANT HATFIELD:  MR. LARRY YARBROUGH

FOR DEFENDANT WILLIAMS:  MR. DAMON STEVENSON



TRANSCRIBED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR

---

501 E. Court, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4187

TABLE OF CONTENTS


JEREMIAH RAYNER

    Direct Examination By Mr. Wansley  ...................5

    Cross-Examination By Mr. Stevenson  ................11

    Cross-Examination By Mr. Yarbrough  ................16

    Cross-Examination By Mr. Sellers  ..................18

ANTOINETTE WILLIAMS

    Direct Examination By Mr. Stevenson  ...............33

```
 1              THE COURT:  All right.  Who's representing Mr. --
 2   Mr. Martin?
 3              MR. SELLERS:  Aafram Sellers on behalf of Mr. Martin.
 4              THE COURT:  Mr. Hatfield?  Who's representing
 5   Mr. Hatfield?
 6              THE CLERK:  Mr. Yarbrough.
 7              MR. YARBROUGH:  I'm sorry, Your Honor.
 8              THE COURT:  All right.
 9              MR. YARBROUGH:  I'm representing Mr. Hatfield.
10              THE COURT:  All right.  Thank you.  And Mr. Williams.
11              MR. STEVENSON:  Your Honor, Damon Stevenson here on
12   behalf of Mr. Williams.
13              THE COURT:  All right.  Thank you.  All right.
14              MR. WANSLEY:  Your Honor, may it please the court
15   first?
16              THE COURT:  Yes.
17              MR. WANSLEY:  Just as a point of clarification,
18   looking at -- you're about to call docket 3:16cr72.
19   Mr. Martin, I believe his 3:16cr70 was continued to today so
20   that his lawyer can present witnesses.  And we were going to
21   proceed on Richard Williams and Hatfield today for -- with the
22   agent testimony.
23              THE COURT:  All right.  Thank you.
24              MR. WANSLEY:  Mr. Sellers, is that correct?
25              MR. SELLERS:  (Inaudible)
```

1      MR. WANSLEY:  So, Your Honor, I would -- I would, I

2 guess, suggest that we allow Mr. Sellers --

3      THE COURT:  I'm willing to let him go ahead and

4 participate in this one.  If I find that bond is due in this

5 one, then it may be due in the next one; or if detention is

6 proper in this one, it would be proper in the next one.  So --

7      MR. WANSLEY:  Okay.

8      THE COURT:  -- you may go ahead and participate.

9      MR. WANSLEY:  Your Honor, are you ready for me to call

10 the case?

11      THE COURT:  Yes.

12      MR. WANSLEY:  Yes, Your Honor.  We are here on a

13 detention hearing for the matter *United States v. Charlie Lee*

14 *Martin, L. C. Hatfield and Richard Williams*, all in criminal

15 number 3:16cr72.  And Mr. Martin and Mr. Hatfield and

16 Mr. Williams are present, Your Honor, with their counsel.

17      THE COURT:  All right.  Thank you.  And I'm assuming

18 that everybody's ready to proceed.

19      MR. SELLERS:  Yes, ma'am, Your Honor.

20      MR. STEVENSON:  On behalf of Mr. -- yes, on behalf of

21 Mr. Williams, Your Honor.

22      THE COURT:  All right.  Thank you.  You may proceed,

23 counselor.

24      MR. WANSLEY:  Your Honor, at this time the government

25 would like to call Jeremiah Rayner to the stand.

```
 1            THE COURT:  All right.
 2        (WITNESS SWORN)
 3            MR. WANSLEY:  May I proceed, Your Honor?
 4            THE COURT:  You may.
 5                        JEREMIAH RAYNER,
 6   having first been duly sworn, testified as follows:
 7                        DIRECT EXAMINATION
 8   BY MR. WANSLEY:
 9   Q.  Good afternoon again, Mr. Rayner.
10   A.  Afternoon.
11   Q.  I believe -- well, this is a new record.  So, again, will
12   you please state where you're employed.
13   A.  I'm a special agent for Drug Enforcement Administration.
14   Q.  And how long have you been with the DEA?
15   A.  Approximately six years.
16   Q.  And as an agent with DEA, do you have -- or do you
17   investigate drug activity?
18   A.  Yes.
19   Q.  And so are you familiar with the indictment concerning
20   Charlie Lee Martin, L. C. Hatfield and Richard Williams?
21   A.  I am.
22   Q.  Please explain to the court the facts that you learned as
23   part of your investigation that support that indictment.
24   A.  It was authorized wire intercepts on Mr. Hatfield and
25   Mr. Martin.  If I remember the day correctly, November 8th was
```

1    when Mr. Richard Williams was involved.  Agents were able to

2    establish calls in which there were drug transactions that

3    would be occurring between Mr. Williams and Mr. Hatfield at a

4    stash house Mr. Hatfield used on Essex.  And agents were to

5    establish surveillance in the area, watch Mr. Williams arrive

6    and then leave.  Agents surveilled Mr. Williams until he

7    reached Forest, Mississippi, and then they conducted a traffic

8    stop which resulted in the seizure of crack cocaine.

9        And on November 14th, Mr. Hatfield was having discussions

10   of the -- recorded conversations over the wire of Mr. Derek

11   Moseley which were indicative of a drug transaction that was

12   going to occur.  Mr. Moseley came down from I believe it was

13   West Point, Mississippi, and obtained -- we were able to

14   surveil him go to the stash house on Essex and then leave.  A

15   subsequent traffic stop of Mr. Moseley resulted in I believe

16   the seizure of approximately a pound of crack cocaine and four

17   or five ounces of powder cocaine.

18   Q.  I believe you mentioned that happened on November 14, but

19   would -- would I be wrong to say that was October 14?

20   A.  Is it -- maybe.  Oh, I believe, yes, it is 10.  Sorry.

21   October 14th.  And on October 24th, Mr. Hatfield was

22   intercepted having a conversation with an individual named

23   Deontha White.  Again, we were able to surveil Mr. White arrive

24   at the Essex location, leave and the subsequent -- subsequent

25   traffic stop resulting in the seizure of approximately a

1  kilogram of powder cocaine.

2          THE COURT:  Is that in 2014 or '15?

3          THE WITNESS:  That was in '15, Your Honor.

4          THE COURT:  Thank you.  All right.

5  BY MR. WANSLEY:

6  Q.  I might have -- sorry.  I was taking notes.  On

7  October 24th, what did your investigation -- or what did you

8  learn from your investigation on that day?

9  A.  That Mr. Hatfield was -- he was intercepted speaking with

10  Deontha White and a call also came from the same area of

11  West Point area.  He was surveilled leaving on Essex where

12  Mr. Hatfield's stash house location is, surveilled leaving.  A

13  subsequent traffic stop resulted in the seizure of

14  approximately a kilogram of cocaine from Mr. White.

15  Q.  I believe --

16          THE WITNESS:  Do you want me to re-cover the stuff

17  from Mr. Martin that was covered yesterday, Your Honor, as

18  well?

19          THE COURT:  Yes, if you would, please.

20          THE WITNESS:  Okay.

21  BY MR. WANSLEY:

22  Q.  I guess before we go there, let's go ahead and I guess

23  finish up with Mr. Williams and --

24  A.  Yes, sir.

25  Q.  -- I believe there -- you mentioned previously about

1   November 8th --

2   A.  Mr. Williams, yes.

3   Q.  -- and an event regarding Mr. Williams.  Please explain to

4   the court what you learned in your investigation.

5   A.  With Mr. Williams?

6   Q.  Yes.

7   A.  That was when he -- he was surveilled going to Essex.  He

8   was intercepted on the wire talking to Mr. Hatfield, and the

9   calls indicated there would be a drug transaction that would be

10  occurring.  We were able to surveil Mr. Richard Williams go to

11  the Essex stash house, leave, and then subsequently a traffic

12  stop and which resulted in the seizure of crack cocaine.

13  Q.  And was that crack cocaine found on the person of

14  Mr. Williams or in his possession?

15  A.  I don't recall.  It was either on him or in his vehicle,

16  but I don't recall exactly where.

17  Q.  He was associated -- I mean, he was present when officers

18  found it.

19  A.  That's correct.

20  Q.  Now, please go on and explain what you were -- before I

21  interrupted you regarding what your investigation -- what you

22  learned from your investigation regarding Charlie Lee Martin.

23  A.  We were able to run our wire intercept on Mr. Martin as

24  well.  There were -- there were several instances where

25  Mr. Martin conducted drug transactions with a coconspirator

1   Leon Brown.  On one particular day Mr. Brown was receiving two

2   kilograms of cocaine from a courier from his source of supply.

3   Mr. Brown and Mr. Martin discussed a Mr. Antwaine Rhodes being

4   present.  Brown advised -- sorry.  Mr. Martin advised Brown

5   that "I have GB here," who is Antwaine Rhodes, "and he wants

6   one," referring to one kilogram of cocaine.

7       And we were able to watch Mr. Rhodes.  We followed

8   Mr. Martin go to a house on Weeks Street and were able to watch

9   Mr. Rhodes arrive at that location.  He walked in with a black

10  bag.  He then exited the residence with a black bag.  And we

11  surveilled Mr. Rhodes leaving the location and performed a

12  traffic stop on Mr. Rhodes which resulted in the seizure of the

13  half kilogram of cocaine, some U.S. currency and a firearm on

14  his person.

15  Q.  And just as a --

16  A.  Some crack cocaine.

17  Q.  -- I guess a matter of clarification, those facts regarding

18  Charlie Lee Martin pertain to charges that were indicted under

19  3:16cr70.  Correct?  Or the -- the indictment that you

20  discussed yesterday.

21  A.  Oh, yes.  That's correct.

22          MR. WANSLEY:  And, your Honor, I just want to ask

23  clarification.

24  A.  I mean, also the traffic stop on Mr. Martin that day, the

25  same day, on the 20th, and he was -- agents -- that somebody

1  indicated that he had something in his mouth, that Mr. Martin

2  had eaten a large amount of crack cocaine.  He was subsequently

3  taken to the hospital and had to stay overnight.  And then

4  I'm -- I'm not sure of how many days later it was when he was

5  released from the hospital.  He calls Mr. Brown and tells him

6  that -- he tells Mr. Brown that he's about to check into rehab

7  to beat the charges.

8  Q.  Was there a search of any premises that is associated or

9  belonged to Charlie Lee Martin?

10 A.  Not that I'm aware of.  During the search of Mr. Hatfield's

11 residence, there was gang paraphernalia.  Mr. Hatfield's a

12 Gangster Disciple.  There were intercepted calls where there's

13 conference calls between -- meetings between the Gangster

14 Disciples.  And on one call they had discussed an individual

15 who was robbing other Gangster Disciples for drugs or drug

16 money.

17     And it was clear that the conversation indicated they

18 intended on harming that individual.  We were able to contact

19 that individual and make him aware of that to prevent anything

20 from happening.  Those were intercepted on wire.

21     During the search of his residence, there were over three

22 weapons located in Mr. Hatfield's residence at the time of the

23 search warrant.

24     (PAUSE)

25         MR. WANSLEY:  Your Honor, I don't have any further

1  questions, and I tender this witness for cross-examination.

2          THE COURT:  All right.  Cross-examination,

3  Mr. Stevenson.

4                    **CROSS-EXAMINATION**

5  BY MR. STEVENSON:

6  Q.  Good afternoon, Agent Rayner.

7  A.  Good afternoon.

8  Q.  I just have a few questions for you.  I notice this is a

9  five-count indictment.  Isn't it true that Mr. Williams is only

10 named in two of those counts?

11 A.  I believe so.  Whatever the indictment says in it.

12 Q.  And Mr. Williams is only named for one date.  I believe one

13 date.  I believe that's the November 8th, 2015.  Is that

14 correct?

15 A.  That's correct.

16 Q.  But based on that, did he -- is it your belief that he --

17 the latest -- had came to the conspiracy later than the other

18 individuals named in the indictment.

19          MR. WANSLEY:  Objection.  Calls for a legal

20 conclusion.

21          THE COURT:  Rephrase your question.

22 BY MR. STEVENSON:

23 Q.  Based on the dates in the indictment, is he -- is he -- is

24 his offense charged later than the other dates in the

25 indictment?

1    A.  What's his offense charged?

2          MR. WANSLEY:  Objection, Your Honor.  The indictment

3    speaks for itself.

4          THE COURT:  Overruled.

5    BY MR. STEVENSON:

6    Q.  The November 8th indictment, I believe -- if you look at

7    the indictment -- under cross-examination counsel opposite

8    pointed out some of it I think occurred in September and

9    October of 2015.  Is that correct?

10   A.  Yes.

11   Q.  Okay.  But Mr. Williams was not accused of any alleged

12   illegal activity until November 8, 2015.  Isn't that correct?

13   A.  That's correct.  And there -- there may have been some

14   other calls with Mr. Williams.  I don't recall the dates on

15   those.  But I believe there was another -- at least one other

16   call, maybe more, that were intercepted with Mr. Williams.  But

17   that was his specific occasion where drugs were seized from

18   Mr. Williams.

19   Q.  Okay.  If I understood your testimony correct, Mr. Williams

20   was heard on a wire transcript discussing some of the

21   transactions?

22   A.  That's correct.

23   Q.  And during none of those transactions is he alleged to have

24   discussed any act of violence, is he?

25   A.  I'm not familiar with the exact calls on those

1    transactions.

2    Q.  But you can't tell the court as we stand here today that

3    you have any evidence that he's alleged to have discussed any

4    acts of violence against any individual.

5    A.  I couldn't speak to the court either way.  I'm not familiar

6    with the -- with the calls.

7    Q.  Okay.  He was arrested on that date, November 8th.

8    Correct?

9    A.  He was detained.  I'm not sure if he was actually arrested

10   and brought to jail.  I'm not sure.

11   Q.  He was detained without incident.  There was no force, no

12   attempt to leave or flee?

13   A.  That's my understanding.  Yes.

14   Q.  Okay.  No weapons were found on him at that time.

15   A.  Not that I'm aware of.

16   Q.  As well, he was arrested again when this indictment was

17   returned.  I believe it was on Monday or so of this week.  Is

18   that correct?

19   A.  The 19th, yes.

20   Q.  And, again, he was arrested without incident?

21   A.  I believe so.  I wasn't made aware of any incident that

22   occurred.

23   Q.  And he was arrested -- you're not aware that he had any

24   type of weapons or anything of that nature on his presence, are

25   you?

1    A.   Not that I'm aware of.

2    Q.   There's no evidence of gang membership or anything like

3    that on his behalf that you have presented to this court, is

4    there?

5    A.   Not that I'm aware of.

6    Q.   You're not aware of any criminal conviction that he has in

7    the last five-year period, are you?

8    A.   I'm not familiar with his criminal history.  I apologize.

9    Q.   Now, I believe your testimony was that on the date of the

10   incident Mr. Williams was accused of arriving at the house and

11   leaving a short time later?

12   A.   That's correct.

13   Q.   And do you know what was actually recovered when he was

14   detained on November 8th?

15   A.   It was close to an ounce of crack cocaine I believe.

16   Q.   But not just an abnormally large amount of drugs.

17   A.   Still, it's more than a user amount of drugs I would say.

18   Q.   But not enough to indicate that he was actually himself

19   trafficking drugs --

20   A.   I would say an ounce of crack would indicate that it was --

21   it's several -- yeah, it -- it's distributable.

22   Q.   Okay.  Based on the wire -- the wire tran- -- the wire

23   intercepts that you -- you don't have any evidence of any

24   illegal behavior after November the 8th, 2015, do you?

25   A.   As I said, there was other intercepted calls.  I don't

1   recall the dates of when those occurred.

2   Q.  Okay.  So you can't tell the court that he's alleged to

3   have been involved in any activity -- any criminal activity

4   after November 8th, 2015, can you?

5   A.  He very well may.  Like I said, I don't remember the dates

6   of those calls.

7        MR. STEVENSON:  Court's indulgence very briefly.

8   (PAUSE)

9   BY MR. STEVENSON:

10  Q.  All right.  When he was arrested on November the 8th, do

11  you know exactly where he was arrested at?

12  A.  I -- I wasn't physically there.  It was all relayed to me.

13  Q.  But it was here in the Southern District of Mississippi.

14  A.  To my knowledge, it was over around Forest, Mississippi.

15  Q.  When he was arrested this past week, it was also here in

16  the Southern District of Mississippi?

17  A.  I believe he was arrested in Forest as well, if I remember

18  correctly.

19  Q.  You don't have any information to present to the court that

20  he's traveled outside of this district, do you?

21  A.  Not that I'm aware of.

22  Q.  All right.

23        MR. STEVENSON:  No --

24  A.  Either way.

25        MR. STEVENSON:  -- further questions, Your Honor.

1    THE COURT:  All right.  Mr. Hatfield, Mr. Yarbrough,

2    cross-examination.

3                        **CROSS-EXAMINATION**

4    BY MR. YARBROUGH:

5    Q.  I've got a few basic questions for you, as these only apply

6    as to Mr. Hatfield.  Was there any wire worn by (inaudible) in

7    this case?

8         MR. WANSLEY:  Objection, Your Honor.  This is outside

9    the scope of detention.

10        THE COURT:  What's the basis?

11        MR. YARBROUGH:  I'm sorry, Your Honor?

12        THE COURT:  What's your response to the objection?

13        MR. YARBROUGH:  Your Honor, I mean, I -- just a basic

14   question.  I mean -- I mean, I haven't seen anything.  I've had

15   very little time to interview my client.  I'm just trying to

16   get basic --

17        THE COURT:  If you're not prepared to go forward

18   today, I'll reset it for you.  There has been a grand -- an

19   indictment.  The grand jury's returned an indictment.  So

20   probable cause has already been established.  So there won't be

21   any discovery.

22        MR. YARBROUGH:  Oh, I understand that.  I understand

23   that part.

24        THE COURT:  But as to detention, you can ask whatever

25   questions you want.

1          MR. YARBROUGH:  I understand that.

2    BY MR. YARBROUGH:

3    Q.  You mentioned something about a search.  Was a search made?

4    And I had problems understanding what you said.  You did say

5    that there was a search made of Mr. Hatfield's person or

6    premises?

7    A.  Mr. Hatfield's residence, that's correct.  There was a

8    search.

9    Q.  Pursuant to a warrant.

10   A.  Yes.

11   Q.  I noticed that this was a multi-jurisdictional --

12   A.  Operation?

13   Q.  -- jurisdictional -- what I want to say, there was so many

14   agencies involved, from DEA, MBN.  Was this primarily an MBN

15   case or a DEA case?

16          MR. WANSLEY:  Objection, Your Honor.  Outside the

17   scope of detention.

18          THE COURT:  You can ask who was involved if you want

19   to.  And if you know, you can answer the question.

20   A.  The primary agency was DEA.  MBN was involved as well along

21   with ATF.

22   BY MR. YARBROUGH:

23   Q.  Okay.  And only involvement alleged as to Hatfield

24   (inaudible)?  Is that correct?

25   A.  The only alleged involvement?  I'm sorry.  Repeat your

1   question.  I didn't understand.

2   Q.  Is there anything outside of the involvement -- the

3   indictment that pertains to Mr. Hatfield?

4   A.  Were there other occasions where illicit activity occurred?

5   Is that what you're asking?

6   Q.  Correct.

7   A.  Yes, there were other occasions.

8   Q.  Okay.

9           MR. YARBROUGH:  No further questions at this time.

10          THE COURT:  All right.  Mr. Sellers for Mr. Martin.

11  Cross-examination.

12          MR. SELLERS:  May I proceed, Your Honor?

13          THE COURT:  You may.

14                      **CROSS-EXAMINATION**

15  BY MR. SELLERS:

16  Q.  Good afternoon, Detective Rayner.

17  A.  Afternoon.

18  Q.  Agent Rayner.  I apologize.

19  A.  That's fine.

20  Q.  You were questioned about -- Mr. Martin was charged in two

21  indictments.  Is that correct?  In 72 and there's 70.

22  A.  Yes, sir.

23  Q.  Correct?  All right.  And you testified yesterday in 70 and

24  you were asked questions about that for clarification today.

25  Now, the Leon Brown discussions just had with counsel opposite,

1  that's dealing with cause number 70.  Correct?

2  A.  Yes, sir.

3  Q.  All right.  And then the fact that Brown and Martin

4  discussed drugs and then Antwaine Rhodes, that's with 70.

5  Right?

6  A.  That's correct.

7  Q.  All right.  As we discussed yesterday, this wire intercept,

8  it doesn't specifically say "drugs."  Correct?  There's no

9  mention of drugs.  Right?

10  A.  The actual word "drugs"?

11  Q.  Yes.

12  A.  No.  It used -- it's coded language.  That's correct.

13  Q.  And it's coded -- you determined that it's coded.  Correct?

14  A.  It's not solely on -- based on me.  It's a cooperative

15  investigation.  Everybody puts their thoughts and knowledge and

16  experience of drug trafficking, wiretaps, everything that all

17  of our experience puts together.

18  Q.  All right.  With regards to -- you said Mr. Rhodes went to

19  Mr. Martin's house with a black bag and left with a black bag.

20  A.  Mr. Rhodes went to Mr. Martin's -- Mr. Martin's house, yes.

21  Q.  Left with a black bag.  And you stopped Mr. Rhodes.

22  A.  That's correct.

23  Q.  All right.  And you found drugs on Mr. Rhodes.

24  A.  That's correct.

25  Q.  All right.  You didn't leave there and go to Mr. Martin's,

1    correct, on that date?

2    A.  No.  We were conducting traffic stops.  There were several

3    individuals leaving that location.

4    Q.  Okay.  But no drugs were found on that day at Mr. Martin's

5    house.

6    A.  At Mr. Martin's house, no.

7    Q.  All right.  No large sums of money or anything like that

8    was found at Mr. Martin's house on that date.  Correct?

9    A.  No, there weren't.

10   Q.  So there was no evidence that he either possessed drugs

11   that day or possessed money in exchange for drugs that day.

12   Correct?

13   A.  That's incorrect.  There was -- there's a lot of evidence,

14   circumstantial evidence, with a wire that's corroborated by

15   when we stopped Mr. Rhodes regarding that a drug transaction

16   had occurred and Mr. Martin was a part of that drug

17   transaction.

18   Q.  And -- I'll ask it this way, then.  I know you're saying

19   based on circumstantial evidence, but black bag goes in, black

20   bag comes out.  Correct?

21   A.  That's correct.

22   Q.  You don't know contents of black bag when it goes in.

23   Correct?

24   A.  That's correct.

25   Q.  You only know the contents of what's found when you arrest

1    Mr. Rhodes.  Correct?

2    A.  That's correct.

3    Q.  Okay.  So you have no proof that drugs didn't go in and

4    drugs didn't come out.  Correct?

5    A.  Like I said before, this -- it's circumstantial.  However,

6    the intercepted calls, the fact that Mr. -- everything was

7    indicative of a drug transaction that stated Mr. Rhodes was

8    going to be purchasing it and then we stopped Mr. Rhodes with

9    drugs is all indicative and indicates that there was a drug

10   transaction and Mr. Martin was involved.

11   Q.  Okay.  You have no proof that money went in and drugs came

12   out.  Correct?

13   A.  Other than circumstantial evidence --

14   Q.  Yeah.

15   A.  -- and the wiretaps of everyone talking, no.

16   Q.  All right.  So similar to if I travel, I carry my suitcase

17   with me.  When I land in Miami, for instance, the bag I brought

18   is the bag I leave with when I leave the airport.  Correct?

19   A.  If that's --

20          MR. WANSLEY:  Objection, Your Honor.

21   A.  -- how you travel.

22          MR. WANSLEY:  I mean, it sounds like we're arguing

23   probable cause now.

24          MR. SELLERS:  Judge, to that objection, the court has

25   to determine the weight of the evidence in determining

```
1    detention.  Our understanding is there's --
2             THE COURT:  I am, but you can ask a question.  As to a
3    hypothetical --
4             MR. SELLERS:  Yes, ma'am, Your Honor.
5             THE COURT:  -- it doesn't help the court much.
6             MR. SELLERS:  Okay.
7             THE COURT:  So ask him a question.
8             MR. SELLERS:  Okay.  Thank you.
9    BY MR. SELLERS:
10   Q.  To be clear, no drugs found on Mr. Martin or in his home or
11   any cash on the date you arrest Mr. Rhodes.  Correct?
12   A.  I'm not sure if there was -- I know he had eaten crack
13   cocaine.
14   Q.  I'm coming to that one.  I'm sorry.
15   A.  Okay.
16   Q.  All right.
17   A.  But that was the same day.  So that was the question.
18   Q.  All right.  So there was a traffic stop on Mr. Martin that
19   same day that Mr. Rhodes was stopped.
20   A.  That's correct.
21   Q.  All right.  He wasn't charged with possession that day.
22   Correct?
23   A.  No.  He was released to the hospital given his condition.
24   Q.  Okay.  I get the released from the hospital part; but if he
25   actually, in fact, possessed drugs, he could have been released
```

1    from the hospital to an agency to be arrested.  Correct?

2    A.  I'm not sure how the agencies work with that, sir.  It's

3    different for every agency.  I'm not familiar with MBN's

4    policy.

5    Q.  So because he was admitted to the hospital, you're saying

6    he wasn't charged with possession?

7    A.  Well, he ultimately was charged in this conspiracy.  But

8    that was the reason why he was not taken to jail that day is

9    because he was admitted to the hospital is my understanding.

10   Q.  There were no drugs found in his car.

11   A.  I'm not sure if there were traceable amounts of crack

12   cocaine or not on his -- on the man's mouth, and I don't recall

13   if there was a test on it or not.

14   Q.  So as you sit here today, you don't know if that substance

15   he ingested was even crack cocaine at all.  Correct?

16   A.  It was relayed to me that it was crack cocaine.

17   Q.  All right.

18   A.  I'm not sure if he stated that to the ambulance or not.

19   But everything I have indicates it was crack cocaine from the

20   agents that were there on scene.

21   Q.  Did the agents test the drugs?

22   A.  I don't recall.

23   Q.  You have no report and you -- are you the lead investigator

24   on this case or agent?

25   A.  I am, one of them.

1  Q.  The reports come to you to bring this case to the grand
2  jury.  Correct?
3  A.  I don't know if they all come to me.  I mean, we review the
4  reports.  Different agents write reports.  Obviously, given the
5  size or magnitude of the case, there were several agents
6  writing several different reports.
7  Q.  And I respect that and I understand that.  But, ultimately,
8  in putting this case together, all those reports come to you.
9  That's why you're the agent sitting here testifying.  Correct?
10 A.  I wouldn't say all the reports come to me.  I review -- I
11 review the information for grand jury.
12 Q.  Okay.  In reviewing for grand jury, did you see a lab
13 report or drug report that said that that substance was, in
14 fact, drugs the date that it was allegedly ingested?
15 A.  It wouldn't have been a lab report.  It would have been a
16 presumptive test.  And I don't recall if there was anything in
17 the reports or not --
18 Q.  Okay.
19 A.  -- regarding that.
20 Q.  And that's all the information you just testified to with
21 regard to Mr. Martin.  Correct?
22 A.  That's correct.
23 Q.  So -- and then we discussed it yesterday, when he was
24 arrested, there was no drugs found.  Correct?
25 A.  Mr. --

1  Q.  Mr. Martin.

2  A.  You're talking about the arrest on the 19th, this week.

3  Q.  Yes.

4  A.  To my knowledge, there was no drugs, no.

5  Q.  No large sums of money.

6  A.  Not that I'm aware of.

7  Q.  No weapons.

8  A.  Not that I'm aware of.

9  Q.  No new testimony is -- regarding this indictment in 72.

10 Correct?

11 A.  No new testimony regarding -- I can cover that date --

12 those dates if you'd like.

13 Q.  But you weren't questioned about them by counsel opposite.

14 Right?

15 A.  Not directly, no.

16 Q.  Okay.  So Mr. -- and Mr. Martin is charged in the

17 conspiracy count.  There was no testimony with regards to

18 Mr. Martin being on an intercept with any of these individuals

19 in this indictment.  Correct?  This is 72.

20 A.  What's -- who's on that indictment?

21 Q.  The gentlemen you just spoke about.

22 A.  Mr. Williams?

23 Q.  Yes.

24 A.  Is that what you're saying, Mr. Williams --

25 Q.  Yes.

1  A.  -- and -- there was -- there was intercepts between

2  Mr. Martin and Mr. Hatfield.  There was no intercepts between

3  Mr. Martin and Mr. Williams.

4  Q.  And is that the intercept when you said he called and

5  talked about going to rehab?

6  A.  Yes.  That was an intercept.

7  Q.  Okay.  So that's the only evidence linking him to him is

8  that he called and said he's going to rehab?

9  A.  No.  There were multiple calls, as discussed before,

10  regarding Mr. Martin's involvement in that drug transaction.

11  Q.  I think I missed that testimony, because you indicated

12  in -- as I noted, you dealt with dates with regards to

13  Mr. Hatfield and Mr. White, Mr. Hatfield and Mr. Moseley, and I

14  believe there's a November 8th date.  So what's your testimony

15  with regard to Mr. Martin?

16  A.  Mr. Martin was involved in the November 20th.

17  Q.  November 20th.  Are you certain that it was November 20th?

18  A.  Under that indictment?

19  Q.  Yes, under 72.

20  A.  No.  That was not included in that indictment.  That was in

21  the other indictment.

22  Q.  I'm talking about 72 indictment.  That's what I -- the

23  counts I see is the Count 1 for conspiracy and then there's a

24  Count 3 for something on October 14th.

25  A.  And those were calls -- there were calls between Mr. Martin

1    and Mr. Hatfield where Mr. Hatfield -- Mr. Martin supplied

2    Mr. Hatfield with the drugs that he, in turn, supplied the -- I

3    believe it was Derek Moseley.

4    Q.   Okay.  And on those calls, the intercept, they didn't state

5    specifically drugs.  Correct?

6    A.   They did not give the specific name of the drug.  They used

7    coded language.  That's correct.

8    Q.   What was the coded language used?

9    A.   I don't recall what coded language they used.

10   Q.   Okay.  Mr. Martin on that day was not found in possession

11   of any drugs.  Correct?

12   A.   That's correct.

13   Q.   He was not found in possession of any large sums of money

14   on that day.

15   A.   That's correct.

16   Q.   Was there surveillance done of the transaction between

17   Mr. Hatfield and Mr. Moseley?

18   A.   Mr. Hatfield and Mr. -- there was actually -- Mr. Martin,

19   Hatfield and Moseley were all surveilled.

20   Q.   On that date.

21   A.   The day that Mr. Moseley acquired that, yes, Mr. Martin was

22   there.

23   Q.   Okay.  Where did this take place?

24   A.   That was also on Essex.  Mr. Martin was surveilled going to

25   Essex.

Q.  Okay.  Did anyone traffic stop him or tie him to any drugs
on that date?

A.  No.

Q.  Okay.  When he left the residence, did he have any money or
any drugs that day?

A.  He was not -- I don't know.  I wasn't on the -- we didn't
traffic stop him.

Q.  So the testimony is someone saw him going to the house that
day.

A.  The testimony is that there was intercepted calls of
Mr. Martin and Mr. Hatfield having conversations indicative of
a drug transaction.  We then surveilled Mr. Martin go to
Mr. Hatfield's house on Essex.  And then we surveilled
Mr. Moseley, who also was having conversations with
Mr. Hatfield, go there and then leave; and then he was stopped.

Q.  Okay.

A.  The calls indicated that Mr. Martin was supplying
Mr. Hatfield.  In turn, Mr. Hatfield was saying that he had
someone, who was Mr. Moseley, that was going to be the
ultimate.

Q.  Did anyone see Mr. Martin carry anything into that home?

A.  No.

Q.  Okay.  And, again, he wasn't stopped.  So you didn't see
him leave with anything.  Correct?

A.  That's correct.

1  Q.  And Mr. -- yesterday you stated that they were talking

2  about buying cars or selling cars.  Is that the same

3  conversation that was had that was intercepted?

4  A.  I don't recall the language on this specific date.

5  Q.  And I believe I asked yesterday, you're not aware of

6  whether any of these defendant actually sell used cars and

7  could have been talking about that.  Correct?

8  A.  You did ask me that.  That's correct.

9  Q.  And you didn't know whether they did or not.  Correct?

10  A.  I did not.  No.

11  Q.  Okay.

12      MR. SELLERS:  No further questions.

13      THE COURT:  All right.  All counsel, I will tender to

14  you to cross-examination -- I mean, redirect.

15      MR. WANSLEY:  No redirect, Your Honor.  The

16  government -- I thought I did this before, but just to cover my

17  bases, would like to admit the pretrial services report for

18  these three defendants, Your Honor.

19      THE COURT:  All right.  Agent Rayner, you may step

20  down.

21      THE WITNESS:  Thank you, Your Honor.

22      THE COURT:  Any objection to the report, Mr. Sellers,

23  for Mr. Martin?

24      MR. SELLERS:  No, ma'am, Your Honor.

25      THE COURT:  Mr. Yarbrough, for Mr. Hatfield.

1    MR. YARBROUGH:  Your Honor, the only thing we would

2   object to is on the previous pretrial services report provided

3   the probation office, it resulted in (unintelligible).

4    THE COURT:  I'll note your objection and overrule it.

5   Any objection, Mr. Stevenson?

6    MR. STEVENSON:  Your Honor, we would just object to

7   the portion that deals -- page three that deals with substance

8   abuse.  There is -- it contains reference to a substance that

9   had not been confirmed, Your Honor.  So to the extent that it's

10  not been actually confirmed, we'd object to that.  On page

11  three there is a charge listed as "disposition unknown."  So we

12  would make an objection to that.

13   THE COURT:  Note your objection.  It's overruled.

14  Yes, sir, Mr. Whitver.

15   PROBATION OFFICER:  Your Honor, if it pleases the

16  court, just one additional matter on Richard Williams'

17  proffered report.  It does not contain a conviction that

18  probation's later learned about.  The conviction was in Scott

19  County and the cause number is 08CR031SC-C, and that was in

20  October 1st of 2008 in which the defendant was convicted of

21  felon in possess -- possession of a firearm by a convicted

22  felon.

23   He was sentenced to three years in the custody of the

24  Mississippi Department of Corrections with two years suspended,

25  one to serve; a fine of $1,500; and two years post-release

1  supervision.  It's a matter that began before the circuit court

2  with regards to his expiration stating that he expired

3  supervision on July 2011, had an unpaid balance of $1,593

4  payable to the Scott County Circuit Clerk's Office.  I'm not

5  clear as to -- there was a subsequent order issued on

6  February 20th of 2016 regarding that he was moved from active

7  status pursuant to SOP 27-03-02.  Your Honor, I'm basically not

8  familiar with what issue that is or what the -- where the

9  matter stands at this time.

10          THE COURT:  All right.  So I agree with the letter he

11  was on -- still on some kind of parole or supervision during

12  the year 2015.

13          PROBATION OFFICER:  According to the information

14  probation has, this conviction would have been 2000 -- October

15  1st of 2008 and it's -- hasn't -- just from what probation is

16  noticing from the records that we've received from the

17  Mississippi Department of Corrections, it appears that he was

18  on supervision in July of 2011; but, Your Honor, I am

19  unaware --

20          THE COURT:  (Unintelligible)

21          PROBATION OFFICER:  -- after that point.  It appears

22  that his term of supervision expired.  I don't know under

23  what -- what grounds that they might have to do that.  So I

24  have no information to let the court know as to whether or not

25  he was actually on supervision at the time of this offense.

1          THE COURT:  All right.  Thank you for the addendum,

2     Mr. Whitver.  Mr. Stevenson, any questions?

3          MR. STEVENSON:  Your Honor, I'm a little confused

4     because from my understanding is that this is alleged to have

5     occurred in 2008.  Correct?  So he was in -- so one year.

6     Under supervision of how long?

7          PROBATION OFFICER:  He was sentenced to three years

8     and (unintelligible) but it's three years in the custody of the

9     Mississippi Department of Corrections, pay a fine of $1500 plus

10    all costs of court.  Two years of the sentence suspended,

11    leaving one year to serve, after which the defendant was placed

12    on post-release supervision for a period of two years.

13          THE COURT:  All right.

14          PROBATION OFFICER:  That's reading right from the --

15          THE COURT:  All right.  For these purposes the court

16    does not have any basis to believe that he was still on any

17    kind of supervised release.  It is noted, though, this is an

18    additional conviction for a felony offense, being a felon in

19    possession of a firearm in 2008.

20          MR. STEVENSON:  Thank you, Your Honor.

21          THE COURT:  All right.  The pretrial services reports

22    have been adopted.  Any rebuttal?  There is no -- no redirect

23    and the government has rested?

24          MR. WANSLEY:  Yes, Your Honor.

25          THE COURT:  All right.  Mr. Stevenson, what do you

1  have on behalf of Mr. Williams?

2          MR. STEVENSON:  Your Honor, we call Ms. Antoinette

3  Williams.

4                      **ANTOINETTE WILLIAMS,**

5  having first been duly sworn, testified as follows:

6                      **DIRECT EXAMINATION**

7  BY MR. STEVENSON:

8  Q.  Ms. Williams, will you state your full name for the court,

9  please.

10  A.  Antoinette Williams.

11  Q.  And where do you reside?

12  A.  Forest, Mississippi.

13          THE COURT:  Ms. Williams, would you spell your first

14  name?

15          THE WITNESS:  A-N-T-O-I-N-E-T-T-E.

16          THE COURT:  Thank you.  You may proceed.

17  BY MR. STEVENSON:

18  Q.  One more time.  Speak a little louder.  Make sure everyone

19  hears you.  Where do you reside?

20  A.  Forest, Mississippi.

21  Q.  And what county is that?

22  A.  Scott County.

23  Q.  Who else resides in that residence with you?

24  A.  Richard Williams and our three kids.

25  Q.  Okay.  What is your relationship to Mr. Richard Williams?

1    A.    He's my husband.

2    Q.    When were y'all married?

3    A.    February 2011.

4    Q.    Where were y'all married at?

5    A.    Scott County courthouse.

6    Q.    Have you all resided in Scott County the entire tenure of

7    your marriage?

8    A.    Yes.

9    Q.    Do y'all own any property outside of the state of

10   Mississippi?

11   A.    No.

12   Q.    Do you know -- does your husband own a passport?

13   A.    No.

14   Q.    Have you ever known him to leave the country?

15   A.    No.

16   Q.    Now, what does your husband do every day?

17   A.    He takes care of our kids, our autistic son and my

18   daughter.

19   Q.    Okay.  And explain -- explain to the court, just to be

20   clear, you said your -- I think it was an autistic son?

21   A.    Yes.

22   Q.    And what type of care does your son require?

23   A.    He have to have someone with him at all times.  He has

24   autism, development inabilities, speech impairment, a list of

25   things.  Someone have to be with him that can be -- manage him

1    and contain him.  If not, then he's all over the place.

2    Q.  All right.  And so just so the court can be clear, who is

3    that that takes care of him during the day?

4    A.  Richard Williams.

5    Q.  All right.  Why don't you -- you're not able to be there

6    during the day?

7    A.  I work.

8    Q.  Okay.  So you're the breadwinner of the family?

9    A.  Yes.

10   Q.  Okay.  This length that Mr. Williams has been incarcerated,

11   who's taking care of his son?

12   A.  I am.

13   Q.  All right.  And have you been able to take care of your

14   child and work?

15   A.  No.

16   Q.  When is the last time you went to work?

17   A.  Monday.

18   Q.  Is that the day that your husband was arrested?

19   A.  Yes.

20   Q.  Tell the court, is that one of the reasons you're asking

21   the court to release your husband?

22   A.  Yes.

23   Q.  If you're not able to work, what income is limited -- is

24   your household limited to?

25   A.  Just my son's Social Security.

1    Q.  Is that sufficient to be able to meet the needs of your

2    family?

3    A.  No.

4    Q.  Do you have any reason to believe that if Mr. Williams is

5    released on bond by this court that he will not appear at any

6    future court appearances?

7    A.  No, I have no reason to believe he wouldn't.

8    Q.  Okay.  Do you all have a phone --

9    A.  Yes.

10   Q.  -- at your home?  Okay.  And that phone -- if the court

11   were to entertain something like an electronic monitor, would

12   there be any problem with the court using that phone to make

13   sure Mr. Williams is where he's supposed to be when he's

14   supposed to be there?

15   A.  No, there's no problem.

16        MR. STEVENSON:  Your Honor, we would tender this

17   witness.

18        THE COURT:  Any cross-examination?

19        MR. WANSLEY:  No cross-examination, Your Honor.

20        THE COURT:  You may step down.  What would you have?

21        MR. STEVENSON:  Defense would rest and just like to

22   make the appropriate oral -- the appropriate oral argument at

23   the appropriate time.

24        THE COURT:  All right.  Thank you.  Mr. Yarbrough, on

25   behalf of Mr. Hatfield what would you present?

1          MR. YARBROUGH:  Your Honor, on behalf of Mr. Hatfield,

2     at this time we would waive detention and reserve the right to

3     be heard (unintelligible).

4          THE COURT:  Well, if you don't want to present any

5     witnesses -- he can.  He hasn't waived -- since we've put on

6     proof here, you haven't exactly waived the hearing.  That would

7     have been done at the beginning.

8          MR. YARBROUGH:  I understand, your Honor.  We should

9     have made that when we started (unintelligible).

10         THE COURT:  All right.  Evidence has been put on.  So

11    the court is prepared to make a finding.  If he wants to put on

12    evidence, he certainly can.

13         MR. YARBROUGH:  I understand that, Your Honor, but

14    (unintelligible).

15         THE COURT:  Yes.

16     (PAUSE)

17         THE COURT:  If he wants a record, you may also

18    consider making a proffer.  That is, you say what these

19    witnesses would be expected to say, if they're available to be

20    cross-examined, should the other side want to cross-examine.

21         MR. YARBROUGH:  Your Honor, in light of the

22    situation -- I should have made this motion prior to the

23    hearing starting.  There's been understandings between

24    defendant and counsel.  But we would ask the court for a

25    special condition for this defendant because he has no prior

1    felony convictions.  In the probation office report, they

2    stated in the report that there's no factors that would keep

3    him from appearing, that he --

4          THE COURT:  Let me make sure I understand your

5    position.  It sounds like you're arguing for some kind of bond

6    in release in spite of the announcement that you're waiving

7    your --

8          MR. YARBROUGH:  That's what would be coming from these

9    witnesses, Your Honor, that they're --

10          THE COURT:  All right.  You're making a proffer.

11          MR. YARBROUGH:  Proffer.  That's what I thought I

12    said.  I said --

13          THE COURT:  Okay.

14          MR. YARBROUGH:  -- that they -- that there's no

15    factors that he would not make an appearance and there's no

16    factors that he is a violent individual or he would be a threat

17    to the community.  That's primarily what would be put on.

18          He's married with two children.  All this is reflected

19    in the report.  And he is -- the only condition that he cannot

20    show is something to satisfy the conditions other than possibly

21    electronic monitoring.  That's primarily what the witnesses

22    would testify to, Your Honor.

23          THE COURT:  All right.  Thank you for the proffer.  In

24    light of his proffer, if the government wishes to cross-examine

25    any of the parties, I would ask counsel to identify those

1  parties for cross-examination.

2          MR. WANSLEY:  At this time, Your Honor, there's no --

3  based on the proffer, there's no reason to cross-examine

4  anyone, Your Honor.

5          THE COURT:  All right.  Would you tell us who is here

6  and would have made that proffer, Mr. Yarbrough.

7          MR. YARBROUGH:  Can you guys identify yourself?

8          THE COURT:  Very strong family support.  All right.

9  How many -- one, two, three, four, five, six -- one, two,

10 three, four, five, six, seven, eight, nine, ten, eleven,

11 twelve -- 16 individuals stood up in the audience in support of

12 Mr. Hatfield.  All right.  Thank you.  You may be seated.

13          All right.  And so you rest at this time?

14          MR. YARBROUGH:  Yes, Your Honor.

15          THE COURT:  Mr. Sellers, on behalf of Mr. Martin.

16          MR. SELLERS:  Your Honor, I'm going to -- if I may

17 make a proffer on behalf of Mr. Martin.  And I will for the

18 record state that we -- my office and myself attempted to

19 contact family members.  One of the issues that Mr. Martin is

20 dealing with is his ill mother who's 77.  And she's listed as

21 his contact person, and I think she's dealing with some issues

22 that would -- made it difficult for her to appear in court

23 today.

24          I would let the -- inform the court that Mr. Martin,

25 based on the presentence report, is -- investigation, is -- I

1    said presentence investigation, but the investigation by

2    probation, is a lifelong resident of Hinds County.  He has

3    several children, one of which is a one-year-old that he takes

4    care of, along with his ill mother.  And he does have a

5    daughter that's present in court today, Mrs. Morris, who is

6    here today.

7            Mr. Martin just respectfully asks the court to

8    consider granting some type of condition of bond based on the

9    fact that he's been taking care of his ill mother for some time

10   now, Your Honor.

11           THE COURT:  All right.

12           MR. SELLERS:  We would rest at this time.

13           THE COURT:  Any cross-examination requested by the

14   government as to the proffer on behalf of Mr. Martin?

15           MR. WANSLEY:  No cross-examination, Your Honor.

16           THE COURT:  All right.  The defendants have rested.

17   Any rebuttal by the government?

18           MR. WANSLEY:  Your Honor, no rebuttal.

19           THE COURT:  All right.  The government has rested

20   finally.  All right.

21           I don't know if -- I don't believe you were present in

22   the courtroom when I explained before that you have the burden.

23   There is a presumption that operates against you in the law

24   because of the seriousness of the crime that you've been

25   charged with.  The law presumes because of this crime that

1   there's no condition or combination of conditions that would

2   ensure the safety of the community, that you're not a danger,

3   that you're not a flight risk.  And so it's your burden to come

4   forward and rebut that presumption.  In other lesser considered

5   offenses, it would be just the opposite.

6        And the court has to consider a number of things.  The

7   factors include the nature and circumstances of the offense,

8   whether it involves a controlled substance or firearms, the

9   weight of the evidence against you, the history and

10  characteristics of the person, any ties, whether or not you

11  worked at a steady job, and the nature and seriousness of the

12  offense and other factors like that, your criminal history, if

13  you have one or not.  All of those are factors that the court

14  has to consider and weigh.  And you would have to present

15  evidence to the court to outweigh any of those that mitigate

16  against you.

17       Let me go ahead if counsel wants to present any

18  argument at this time.  I know some of you indicated that you

19  did.  I'll entertain your argument.  But this is a presumption

20  offense.  Does the government wish to make any opening remark?

21       MR. WANSLEY:  The government relies on the testimony

22  that was offered in court, Your Honor, but -- as well as the

23  information from the pretrial services report and just briefly

24  highlight, Your Honor.

25       For Mr. Williams, we now have the revised preserves

```
 1   report that had the 2008 conviction for felon in possession of
 2   a firearm.  Your Honor, for Mr. Martin it appears that there's
 3   an outstanding warrant from 2016 that is listed in his pretrial
 4   services report.  And Mr. Hatfield, Your Honor, again, the
 5   testimony that was offered, plus when the search warrant was
 6   executed, the weapons that were found, plus his affiliation
 7   that was found in the investigation with the Gangster
 8   Disciples, Your Honor.
 9        For all of those reasons, we believe that the
10   defendants have not met their burden to show that they're not a
11   danger or a flight risk, Your Honor.
12        THE COURT:  All right.  Thank you.  Let me start with
13   Mr. Sellers on behalf of Mr. Martin.
14        MR. SELLERS:  May I proceed, Your Honor?
15        THE COURT:  You may.
16        MR. SELLERS:  Your Honor, I would just make the
17   argument that there are -- or there can be conditions to ensure
18   that Mr. Martin appears.  One -- you go down the factors.  And
19   the reason I asked questions about the actual investigation in
20   the case -- and I understand it's not a probable cause hearing,
21   but you look at the weight of the evidence.  I think that
22   weighs in favor of Mr. Martin in this case based on the
23   testimony of the agent based there's no drugs that were
24   recovered in his possession.  There's no large sums of money,
25   there's no weapons found in his possession.  There's this coded
```

1    talk that he speaks of that has led to the agent's

2    interpretation, but there's no explicit talk of drugs.  So I

3    think there's question as far as the weight of the evidence.

4         I do understand Mr. Martin has a criminal history,

5    several felonies.  I know that looks as a negative, but I also

6    look at it from the standpoint that if a person is actually

7    charged with a crime -- he's been charged with some crimes --

8    they actually show up, plead guilty, accept responsibility for

9    those crimes, goes and serves their time, then it indicates

10   that they are willing to show up in this instance if the time

11   comes and when the time comes to appear in court when required

12   at all necessary hearings.

13        So, oftentimes, we look at that as a negative, and

14   which it is -- it does go to a fact there's criminal history,

15   but it also shows accountability to showing up when they're

16   required -- when he's required to be there.  So we would argue

17   that, although he has these prior felonies, he is someone who

18   has shown that he will show up when required and address the

19   courts as necessarily required.

20        He is a lifelong resident of Hinds County.  He's not a

21   flight risk.  The report indicates he has no passport.  So he's

22   not someone who has the means or capabilities to flee the

23   country, but his history indicates he's someone who doesn't

24   have the ability or has never fled the state when faced with

25   these type charges.

1          Again, he's not a danger to the community.  There were

2     no weapons ever found in his possession, Your Honor.  I just

3     believe that based on everything, considering everything there

4     are certain conditions that would ensure that Mr. Martin

5     appears when and where required by the court, Your Honor.

6          THE COURT:  All right.  I'll let you have rebuttal

7     after each one rather than waiting for everybody.  I think that

8     would be the easiest way to do it.  Any rebuttal by the

9     government?

10          MR. WANSLEY:  Just briefly, Your Honor.  As a point of

11    clarification, I believe Attorney Sellers mentioned that his

12    convictions that appear in the pretrial services report show

13    that his client pled guilty; and I don't believe that's the

14    case, Your Honor.  If you're just specifically looking at the

15    pretrial services report, there is a -- I guess a statement in

16    here that's particularly troubling is that the defendant was

17    revoked on June 9, 2003, after being convicted for fleeing

18    police.

19          Your Honor, just, again, pretrial services report,

20    there's an entry for 1993 that shows guilty.  It doesn't show

21    that he pled guilty.  And there's an entry for May 13, 2010,

22    that shows guilty, not that he pled guilty.  And I believe just

23    these actually cut against the argument of counsel, Your Honor.

24          THE COURT:  All right.  Obviously, he showed up --

25    apparently was in court a lot of times, but it doesn't tell us

1  how he got there, whether it was willing -- willingly or

2  unwillingly.  We just know that he was there.

3          MR. SELLERS:  May I address that, Your Honor?

4          THE COURT:  Yes.

5          MR. SELLERS:  Your Honor, in reviewing these and

6  history would tell us that typically there is -- you will see a

7  "failure to appear" or things of those nature in the court

8  filing.  Even the fleeing charge that Mr. Wansley spoke of, it

9  says "convicted."  To be convicted, you have to be present.

10         So the fact that this report is absent of failure to

11  appear, it doesn't say convicted in his absence.  It would

12  indicate or be evidence that he actually was physically present

13  and faced his consequences, Your Honor.  I won't belabor that

14  point, Your Honor.

15         THE COURT:  If it's a misdemeanor, you have to be

16  present to be convicted?

17         MR. SELLERS:  Even in misdemeanor court, Your Honor,

18  the record typically reflects convicted in their absence.

19         THE COURT:  All right.

20         MR. SELLERS:  So there's usually some record of the

21  fact that a person was found guilty in absentia, which this

22  doesn't indicate, Your Honor.

23         THE COURT:  I'll give you A for effort.

24         MR. SELLERS:  Thank you, Your Honor.  I appreciate it.

25         THE COURT:  Mr. Stevenson.

1              MR. STEVENSON:  Your Honor, on behalf of Mr. Williams

2    I would just point out his last known conviction is 2008, I

3    believe, based on the amended presentence report.  So we're

4    about eight years away from that.  There's no evidence to

5    indicate, Your Honor, that he's ever failed to appear.

6    Further, Your Honor, I'm talking about the testimony of his

7    wife.  He lives -- he was out here in the district in Scott

8    County with his family, Your Honor.  Even through the agent,

9    there's no testimony that he had ever made any attempt during

10   the course of this investigation to leave the district, Your

11   Honor.

12              I will point out, based on the testimony of his wife,

13   Your Honor, he is committed to being there to assist in raising

14   his child.  The court heard testimony regarding the child's

15   medical condition and being autistic, how the mother needs to

16   be able to work.  Mr. Williams is the only one who can provide

17   care for that child.  Since Mr. Williams has been incarcerated,

18   Your Honor, she's been unable to work, Your Honor.  And you

19   know how that can affect a family, Your Honor.  So I ask the

20   court to take all of that in mind, Your Honor.

21              No evidence of anything that would indicate that he

22   would not appear for all future appearances as well.

23   Ms. Williams indicated there was a phone.  So if the court

24   wanted to order as a condition of bond some type of electronic

25   monitoring, Your Honor, I think -- one thing about this

1  district, we have one of the -- probably one of the greatest

2  pretrial probation offices who monitor -- who do an excellent

3  job of monitoring individuals once they're released and

4  reporting any violation to this court so the court can

5  immediately address it, Your Honor.

6          So I would ask Your Honor to -- that Mr. Williams be

7  released on bond with any -- any conditions that the court sees

8  appropriate, Your Honor.  But I do think at the time there's

9  been no evidence that he is a flight risk or a danger to the

10  community.

11          I know a lot of times we focus on the fact that it's a

12  presumption case, but there is a rebuttable presumption, Your

13  Honor.  I don't think at this time we failed to show that he'll

14  appear and he does not pose a flight risk.  So we would ask at

15  this time that a reasonable bond be set, Your Honor.

16          THE COURT:  Thank you, sir.  Any rebuttal to argument

17  by counsel?

18          MR. WANSLEY:  No rebuttal, Your Honor.  The government

19  again just relies on the testimony and the pretrial services

20  report.

21          THE COURT:  All right.  And, Mr. Yarbrough, on behalf

22  of Mr. Hatfield.

23          MR. YARBROUGH:  Your Honor, we have no argument.

24          THE COURT:  All right.  Thank you.  I've listened --

25  all the parties have rested.  And the court has listened

1    intently.  And my job has been made very difficult today,

2    having three intelligent men here with extremely serious

3    charges against them and requiring me to make this decision.

4    So I'm going to advise you of my decision.

5           The court has found after listening to the evidence as

6    to Mr. Charlie Martin, he starts with the presumption against

7    him and offers testimony by proffer regarding his mother.  And

8    the court, of course, sympathizes for his mother who is ill and

9    without his assistance.

10          On the other side, the court has before it, of course

11   probable cause having already been established, the fact that

12   this defendant is convicted of fleeing from the police, but he

13   is potentially on parole at the time of the instant offense.

14          Is that correct?  He was on some kind of supervised

15   release, Mr. Martin.  Is that correct, from probation?

16          PROBATION OFFICER:  Supervised release, Your Honor.

17          THE COURT:  All right.  He was on supervised released

18   at the time of the instant alleged offense.  He has an

19   outstanding warrant still from an outstanding jurisdiction; and

20   if I released him, he would still not be free to go.  And the

21   court would note that upon arrest, he was tested by the

22   probation office and tested positive for the use of cocaine.

23          Having considered all this, the court finds by clear

24   and convincing evidence that he has not rebutted the

25   presumption and must be detained in this case.

1    As to Mr. Williams, the court notes that he has strong

2   family support.  His wife testified on his behalf and regarding

3   the need of his presence at home for the purpose of caring for

4   a little child with special needs.

5    The court notes in the other column where this

6   defendant has a criminal history that I have to consider, that

7   this defendant has been convicted of a crime of violence, that

8   being aggravated assault in 1995, and then of the more recent

9   offense in 2008 with being a felon in possession of a firearm.

10    The court notes that this defendant within the last

11   few days was tested and tested positive for both marijuana and

12   cocaine.  He denies the use of cocaine, but sent to the lab for

13   confirmation.  I assume the results are not back yet.

14    PROBATION OFFICER:  That is correct, Your Honor.

15    THE COURT:  However, there doesn't appear to be any

16   contradiction about his use of marijuana.  And the court has

17   real concerns about him being the primary caregiver for a child

18   when he's using marijuana and possibly even cocaine.

19    Based on the defendant's criminal history with the

20   prior felony convictions, the fact that he tested positive for

21   the use of marijuana without challenge and possibly cocaine,

22   the court finds that this defendant should be remanded to the

23   custody of the marshals.

24    And as to Mr. Hatfield, the court must consider the

25   same factors, the weight of the evidence.  And I heard the

1  testimony regarding the defendant's participation in this

2  offense and his alleged stash house, his connection to the

3  Gangster Disciples.  The court finds it of great concern that

4  these defendants, according to the credible testimony, were

5  making threats against other individuals and threatening to do

6  harm to other individuals.

7        The court notes that this defendant has strong family

8  support.  About 16 members of his family and their friends are

9  here in support of him.  But the court also notes that his

10  conduct is not conduct that can be excused by the court.

11       I also note that there were three guns in the

12  residence.  Whether those guns belonged to him or not, they

13  were accessible to him if they were in the residence.  And I

14  don't hear anything to the contrary.

15       We start off with the presumption against him.  With

16  the additional testimony of his involvement in the activity and

17  the threats to other persons in addition to the charges, the

18  court again has no alternative but to find that the defendant

19  should be remanded to the custody of the marshals to await

20  further hearing in this matter.

21       You've been given trial dates.  And at this point

22  you'll be remanded to the marshals for further hearing.  Is

23  there anything further from counsel for Mr. Hatfield?

24       MR. YARBROUGH:  Nothing, Your Honor.

25       THE COURT:  Counsel for Mr. Williams?

1            MR. STEVENSON:  No, ma'am, Your Honor.

2            THE COURT:  Counsel for Mr. Martin?

3            MR. SELLERS:  No, ma'am, Your Honor.

4            THE COURT:  Anything further from the government?

5            MR. WANSLEY:  No, Your Honor.

6            THE COURT:  All right.  Then that concludes this

7    matter.

8        (PROCEEDINGS CONCLUDED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF TRANSCRIPTION

    I, MARY VIRGINIA "Gina" MORRIS, Official Court

Reporter, United States District Court, Southern District of

Mississippi, do hereby certify that the above and foregoing

pages contain a full, true and correct transcript of the

proceedings had in the aforenamed case at the time and

place indicated, which proceedings were recorded by the

courtroom deputy clerk and later transcribed by me from a

digital recording to the best of my skill and ability.

        I certify that the transcript fees and format

comply with those prescribed by the Court and Judicial

Conference of the United States.

        This the 21st day of April, 2017.


                        s/ Gina Morris_____
                        U.S. DISTRICT COURT REPORTER